IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS BARBA, <br><br> Plaintiff, <br><br> v. <br><br> DR. SMITH, et al., <br><br> Defendants. | No. 2:19-CV-1649-KJM-DMC-P <br><br><br> FINDINGS AND RECOMMENDATIONS |

Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is Defendants' unopposed motion for summary judgment. See ECF No. 28.

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See

/ / /

/ / /

1

Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987). To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

2

court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.

## I.  PLAINTIFF'S ALLEGATIONS

Plaintiff, Mr. Luis Barba, names the following as Defendants in the operative second amended complaint: (1) Dr. C. Smith; (2) Dr. S. Wong; and (3) Dr. M. Ashe. See ECF No. 12, pg. 1. Each Defendant was, at all relevant times, a physician employed by California Correctional Health Care Services ("CCHCS") at Mule Creek State Prison ("Mule Creek") in Ione, California. See ECF No. 28, pg. 1. Plaintiff alleges that each of the Defendants knew of varicose veins but failed to provide him with treatment in violation of the Eighth Amendment. Specifically, Plaintiff contends that Defendants know he suffers from "severe, worsening varicose veins," "requiring an operation, yet [have] purposely ignored the condition." ECF No. 12, pg. 3.

Plaintiff only alleges varicose veins in his left leg and contends that the Defendants' inaction has allowed his leg to turn into a "jelly-like mass" that is "about to burst," which would result in either amputation or death. See id. Plaintiff contends that despite the conservative treatment plan the Defendants suggested (compression stockings, staying off his feet for extended periods of time, and losing weight), his condition continues to get worse. See id. at pgs. 3-4. Plaintiff also alleges that he experiences severe pain, feelings of pins and needles, as well as burning pain that radiates down his entire leg from his hip to his toes, which tingle and go numb. See id.

/ / /

/ / /

3

## II. DEFENDANTS' EVIDENCE

Defendants' motion is supported by the sworn declarations of Dr. Smith, ECF No. 28-5, Dr. Wong, ECF No. 28-6, Dr. Ashe, ECF No. 28-7, K. Martin, ECF No. 28-8, and B. Feinberg, ECF No. 28-9. Defendants also rely on Exhibit 1, which is a partial copy of Plaintiff's deposition. See ECF No. 28-4, pgs. 4-95. Defendant also submitted a separate statement of undisputed facts (referred to by Defendants as "SS"), ECF No. 28-3. Plaintiff has not filed an opposition.

Given that Defendants' motion is unopposed, the Court accepts Defendants' statements of the facts of the case. Regarding varicose veins, Defendants state:

> Varicose veins are a common condition, often found in lower legs, in which an individual's veins become twisted and enlarged. (SS Nos. 8-9.) They are especially common amongst obese individuals and individuals who sit or stand for long periods of time. (*Id*.) In many cases, there are no symptoms and varicose veins are simply a cosmetic concern. (SS No. 9.) However, they can cause dull, aching pain and discomfort or signal an underlying circulatory problem. (*Id*.) Usual treatment methods involve conservative treatment such as compression stockings, exercise, and weight loss. (SS No. 10). Invasive procedures to close or remove the veins are generally only be implemented when the varicose veins cause severe mobility impairment, produce pain that is becoming unmanageable, or create a risk for some of the serious complications, which include ulcerations, infection, bleeding, or inability to ambulate. (SS No. 11.)
>
> Dr. Ashe, Dr. Smith, and Dr. Wong believe that several of Mr. Barba's health conditions, including his medically diagnosed obesity, contributed to his varicose veins. (SS No. 12.) Throughout the time Mr. Barba treated with Dr. Wong, he maintained a body mass index between 31 and 33, making him clinically obese. (SS No. 13.) Similarly, when he was Dr. Ashe's patient, his BMI was between 33 and 35. (*Id*.) Dr. Wong's and Dr. Ashe's efforts to conservatively treat Mr. Barba's varicose veins and to improve Mr. Barba's overall health by encouraging the reduction in obesity complied with the medically accepted standards. (SS No. 14.)
>
> Varicose veins generally cause a throbbing, muscle cramping sensation as well as swelling in the lower leg. (SS No. 15.) Varicose veins do not cause burning/ pins and needles sensations that radiate throughout the leg up into the hip. (*Id*.) Nor do varicose veins cause numbness and tingling in the toes or nerve aggravation. (*Id*.) Similarly, Mr. Barba's assertion that his varicose veins are jelly-like and that they may burst, leading to either death or amputation, are not accurate descriptions of the result of a burst varicose vein. (SS No. 16.) Varicose veins close to the skin may occasionally burst, but this usually causes minor bleeding, and could not, contrary to Mr. Barba's claims, cause "sudden death." (SS No. 17.) To date, no doctor has diagnosed Mr. Barba with a ruptured varicose vein. (SS No. 18.)

ECF No. 28-2, pg. 9.

Next, Defendants offer the following summary regarding Plaintiff's other medical conditions:

> In addition to varicose veins, Mr. Barba also suffers from several unrelated medical conditions. This includes plantar fasciitis and an Intermetatarsal Neuroma in his left foot. (SS No. 20.) Plantar fasciitis is a condition related to tendons in the foot, unrelated to varicose veins or any other venous insufficiency conditions. Plantar fasciitis symptoms include left foot pain, numbness, and tingling in the feet. Mr. Barba was also diagnosed with spinal stenosis in his L5-S1 vertebra, which similarly is associated with numbness or tingling and pins and needles sensations. (SS No. 20.) He further reports ankle pain and a clicking pain in his left knee, neither of which are related to varicose vein conditions. (*Id.*)

ECF No. 28-2, pg. 10.

Defendants also provide the Court with a detailed and exhaustive discussion of Plaintiff's extensive treatment history, which the Court does not repeat here.

Finally, Defendants offer the following regarding exhaustion of administrative remedies:

> Mr. Barba filed only one health care grievance related to varicose veins or his claims in this lawsuit: MCSP HC 14045232. (SS No. 115.) Grievance No. MCSP HC 14045232 was prepared by Mr. Barba on June 18, 2014. (*Id.*) The grievance contained allegations that he had repeatedly asked for advice and evaluations for his varicose veins and leg swelling. (*Id.*) Mr. Barba stated that leg compression stockings had been issued and despite the stockings, the condition had progressively worsened. (*Id.*) Dr. Wong was Mr. Barba's treating physician as of June 18, 2014. (SS No. 116.) Grievance MCSP HC 14045232 is the only grievance Mr. Barba has filed with allegations pertaining to Defendant Wong. (SS No. 118.)
> Mr. Barba made no reference to Dr. Smith or Dr. Ashe in the grievance. (SS No. 117.) As of June 18, 2014, neither Dr. Smith nor Dr. Ashe had provided any medical care or been involved in reviewing Mr. Barba's medical care. (*Id.*) Dr. Smith first became involved in Mr. Barba's treatment in response to this grievance. (SS No. 121.) And Dr. Ashe did not become involved in Mr. Barba's treatment until October 2016. (SS No. 61.)
> Mr. Barba appealed Grievance MCSP HC 14045232 to the third level of review and exhausted his administrative remedies on November 10, 2014, when the grievance was denied at the third level of review. (SS No. 119.) Mr. Barba did not file any grievances against Dr. Smith related to Dr. Smith's denial of treatment to Mr. Barba. (SS No. 120.) Mr. Barba did not file a 602 grievance related to Dr. Ashe's treatment or purported failure to treat him. (SS No. 124.) Since Mr. Barba exhausted Grievance MCHP HC 14045232, Mr. Barba did not pursue any grievance, or health care request related to his claims in this lawsuit. (SS No. 129.)

ECF No. 28-2, pgs. 20-21.

## III.  DISCUSSION

In their unopposed motion for summary judgment, Defendants argue: (1) Plaintiff's complaint is barred as against Drs. Smith and Ashe because Plaintiff failed to exhaust administrative remedies prior to filing suit; (2) Plaintiff's complaint is barred as against Dr. Wong by the statute of limitations; (3) Plaintiff cannot establish that any defendant was deliberately indifferent to his medical needs; and (4) Defendants are entitled to qualified immunity.  See ECF No. 28-2.  For the reasons discussed below, the Court finds that Plaintiff failed to exhaust his claims against Drs. Smith and Ashe, that Plaintiff's claim against Dr. Wong is barred by the statute of limitations, and that Plaintiff cannot prevail on the merits of his Eighth Amendment claim as against any defendant.  The Court, therefore, does not address Defendants' qualified immunity argument.

### A. **Exhaustion**

Prisoners seeking relief under § 1983 must exhaust all available administrative remedies prior to bringing suit.  See 42 U.S.C. § 1997e(a).  This requirement is mandatory regardless of the relief sought.  See Booth v. Churner, 532 U.S. 731, 741 (2001) (overruling Rumbles v. Hill, 182 F.3d 1064 (9th Cir. 1999)).  Because exhaustion must precede the filing of the complaint, compliance with § 1997e(a) is not achieved by exhausting administrative remedies while the lawsuit is pending.  See McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002).  The Supreme Court addressed the exhaustion requirement in Jones v. Bock, 549 U.S. 199 (2007), and held: (1) prisoners are not required to specially plead or demonstrate exhaustion in the complaint because lack of exhaustion is an affirmative defense which must be pleaded and proved by the defendants; (2) an individual named as a defendant does not necessarily need to be named in the grievance process for exhaustion to be considered adequate because the applicable procedural rules that a prisoner must follow are defined by the particular grievance process, not by the PLRA; and (3) the PLRA does not require dismissal of the entire complaint if only some, but not all, claims are unexhausted.  The defendant bears burden of showing non-exhaustion in the first instance.  See Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014).  If met, the plaintiff bears the burden of showing that the grievance process was not available.  See id.

The Supreme Court held in Woodford v. Ngo that, in order to exhaust administrative remedies, the prisoner must comply with all of the prison system's procedural rules so that the agency addresses the issues on the merits. 548 U.S. 81, 89-96 (2006).  Thus, exhaustion requires compliance with "deadlines and other critical procedural rules." Id. at 90.  Partial compliance is not enough. See id.  Substantively, the prisoner must submit a grievance which affords prison officials a full and fair opportunity to address the prisoner's claims.  See id. at 90, 93.  The Supreme Court noted that one of the results of proper exhaustion is to reduce the quantity of prisoner suits "because some prisoners are successful in the administrative process, and others are persuaded by the proceedings not to file an action in federal court." Id. at 94.  When reviewing exhaustion under California prison regulations which have since been amended, the Ninth Circuit observed that, substantively, a grievance is sufficient if it "puts the prison on adequate notice of the problem for which the prisoner seeks redress. . . ." Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009); see also Sapp v. Kimbrell, 623 F.3d 813, 824 (9th Cir. 2010) (reviewing exhaustion under prior California regulations).

A prison inmate in California satisfies the administrative exhaustion requirement by following the procedures set forth in §§ 3084.1-3084.8 of Title 15 of the California Code of Regulations.  In California, inmates "may appeal any policy, decision, action, condition, or omission by the department or its staff that the inmate . . . can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a).  The inmate must submit their appeal on the proper form and is required to identify the staff member(s) involved as well as describing their involvement in the issue.  See Cal. Code Regs. tit. 15, § 3084.2(a).  These regulations require the prisoner to proceed through three levels of appeal. See Cal. Code Regs. tit. 15, §§ 3084.1(b), 3084.2, 3084.7.  A decision at the third formal level, which is also referred to as the director's level, is not appealable and concludes a prisoner's departmental administrative remedy.  See id.  Departmental appeals coordinators may reject a prisoner's administrative appeal for a number of reasons, including untimeliness, filing excessive appeals, use of improper language, failure to attach supporting documents, and failure to follow proper procedures. See Cal. Code Regs. tit. 15, §§ 3084.6(b).  If an appeal is rejected, the inmate

is to be provided clear instructions how to cure the defects therein. See Cal. Code Regs. tit. 15, §§ 3084.5(b), 3084.6(a). Group appeals are permitted on the proper form with each inmate clearly identified, and signed by each member of the group. See Cal. Code Regs. tit 15, § 3084.2(h).

In certain circumstances, the regulations make it impossible for the inmate to pursue a grievance through the entire grievance process. See Brown v. Valoff, 422 F.3d 926, 939 n. 11 (9th Cir. 2005). Where a claim contained in an inmate's grievance is characterized by prison officials as a "staff complaint" and processed through a separate confidential process, prison officials lose any authority to act on the subject of the grievance. See id. at 937 (citing Booth, 532 U.S. at 736 n. 4). Thus, the claim is exhausted when it is characterized as a "staff complaint." See id. at 940. If there are separate claims in the same grievance for which further administrative review could provide relief, prison regulations require that the prisoner be notified that such claims must be appealed separately. See id. at 939. The court may presume that the absence of such a notice indicates that the grievance did not present any claims which could be appealed separate from the confidential "staff complaint" process. See id.

A plaintiff's failure to exhaust may be excused if the administrative remedy is deemed "unavailable." See Ross v. Blake, 578 U.S. 632 (2016). Under Ross, "[a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." Id. at 642. The Supreme Court in Ross identified three circumstances in which administrative remedies were unavailable: (1) when it "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) if it is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." Id. at 643-44.

Until June 1, 2020, California allowed inmates to administratively appeal "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs., tit. 15, § 3084.1(a); Munoz v. Cal. Dep't of Corrs., No. CV 18-10264-CJC (KS), 2020 WL 5199517, at *6 (C.D. Cal. July 24, 2020). CDCR used a three-step process

for grievances. Id. (describing the former three-step process). CDCR also used the three-step process for health care grievances until September 1, 2017. Id. CDCR then adopted a new two-step procedure for health care grievances (which was renumbered to its current section number in 2018). See Cal. Code Regs., tit. 15, § 3999.225–.230; see also Singh v. Nicolas, No. 18-cv-1852, 2019 WL 2142105 at *3 & n.1–4 (E.D. Cal. May 16, 2019) (discussing the restructured grievance procedure); Garrett v. Finander, 2019 WL 7879659, at *2–3 (C.D. Cal. Dec. 5, 2019) (describing the new grievance procedures). The first level of review is the institutional level of review. Cal. Code Regs., tit. 15, § 3999.228(a). The second level of review is the headquarters level of review. Cal. Code Regs., tit. 15, § 3999.230(a). The headquarters level is the final level of health care grievance review. Cal. Code Regs., tit. 15, § 3999.230(h). The headquarters level decision also exhausts administrative remedies. Id.

Under the two-step procedure, inmates must submit a health care grievance on a "CDCR 602 HC" form. Cal. Code Regs., tit. 15, § 3999.227(a). First, the inmate must submit the form to the grievance office "where the grievant is housed within 30 calendar days of: (1) the action or decision being grieved, or (2) initial knowledge of the action or decision being grieved." § 3999.227(b). Second, if an inmate is dissatisfied with the institutional level disposition of their grievance, the inmate may appeal to headquarters, the Health Care Correspondence and Appeals Branch. Cal. Code Regs., tit. 15, § 3999.229(a), .230.

Defendants argue that Plaintiff's claims against Dr. Smith and Dr. Ashe are barred because Plaintiff failed to exhaust administrative remedies. See ECF No. 28-2, pg. 21. The Court agrees. Plaintiff has filed only one grievance related to his varicose veins: Grievance No. MCSP HC 14045232. This grievance was filed on June 18, 2014 and . See ECF No. 28-8 pgs. 6, 8-10. It alleged that Plaintiff had sought advice and evaluations for his varicose veins and leg swelling multiple times and that his condition was worsening despite the conservative care he was issued. Plaintiff admits that this is the only healthcare grievance he has filed and that it is the only grievance related to his varicose veins. See ECF No. 28-4, pgs. 84-86. Plaintiff appealed this grievance to the third level of review and exhausted his administrative remedies when the grievance was denied at the third level of review on November 10, 2014. See ECF No. 28-8, pg.

9

6; ECF No. 28-4, pg. 82. At the time the grievance was filed, Dr. Wong was Plaintiff's treating physician, and the grievance makes no mention of either Dr. Smith or Dr. Ashe.

Defendants argue that this exhausted grievance shows two things: (1) the prison appeals system was available to Plaintiff; and (2) Plaintiff failed to exhaust his grievance against Dr. Smith and Dr. Ashe.

### 1. Availability

Defendants argue that Plaintiff's exhausted grievance against Dr. Wong shows that the process (1) was not a "dead end" because Plaintiff made progress on his claim, and received a referral for an ultrasound after filing the grievance; (2) was not "opaque or incapable of use" because Plaintiff was capable of exhausting his appeal; and (3) was not "thwarted by prison administrators" as Plaintiff's questions about the process were answered, information was readily available and posted, and the paperwork necessary to file grievances was available to him. See ECF No. 28-2, pgs. 22-23. Plaintiff's deposition shows an understanding of the grievance process as he explains each step he took when appealing decisions regarding Grievance MCSP HC 14045232. See ECF No. 28-4, pgs. 69-84. The Court agrees that administrative remedies was available to Plaintiff.

### 2. Failure to Exhaust in Relation to Dr. Smith and Dr. Ashe

Defendants argue that despite the availability of the appeals process, Plaintiff failed to file grievances against Dr. Smith or Dr. Ashe in relation to his varicose vein treatment. See ECF No. 28-2, pg. 23. Grievance MCSP HC 14045232 contained allegations solely against Dr. Wong, who was his treating physician at the time. See ECF No. 28-8, pgs. 8-10. Plaintiff did not mention Dr. Smith nor Dr. Ashe in Grievance MCSP HC 14045232 and did not file separate grievances against either Dr. Smith or Dr. Ashe. See ECF No. 28-8, pg. 6; ECF No. 28-4, pg. 8. Dr. Smith and Dr. Ashe did not become involved with Plaintiff's medical care or treatment until after Grievance MCSP HC 14045232 was filed in 2014. See ECF No. 28-2, pg. 13. Dr. Smith's first involvement with Plaintiff's medical care was when he conducted the first level of Plaintiff's medical appeal. See ECF No. 28-5, pg. 2, ¶ 6. Dr. Ashe did not begin working at Mule Creek until September 2016, almost two years after the Grievance was exhausted. See ECF No. 28-7,

1  pg. 6, ¶ 6. The Court agrees that Plaintiff has failed to exhaust administrative remedies for his
2  claim of deliberate indifference against Dr. Smith and Dr. Ashe, entitling them to summary
3  judgment.

        **B.**      <u>**Statute of Limitations**</u>

5          For claims brought under 42 U.S.C. § 1983, the applicable statute of limitations is
6  California's statute of limitations for personal injury actions. See <u>Wallace v. Kato</u>, 549 U.S. 384,
7  387-88 (2007); <u>Jones v. Blanas</u>, 393 F.3d 918, 927 (9th Cir. 2004) ("[f]or actions under 42 U.S.C.
8  § 1983, courts apply the forum state's statute of limitations for personal injury actions."); <u>Jackson
9  v. Barnes</u>, 749 F.3d 755, 761 (9th Cir. 2014); <u>Wilson v. Garcia</u>, 471 U.S. 261, 280 (1985); <u>Karim-
10 Panahi v. Los Angeles Police Dep't</u>, 839 F.2d 621, 627 (9th Cir. 1988). In California, there is a
11 two-year statute of limitations for personal injury actions such as § 1983 cases. See Cal. Civ.
12 Proc. Code § 335.1; <u>Maldonado v. Harris</u>, 370 F.3d 945, 954 (9th Cir. 2004).

13         State tolling statutes also apply to § 1983 actions. See <u>Hardin v. Straub</u>, 490 U.S.
14 536, 543-44 (1998). California Civil Procedure Code § 352.1(a) provides tolling of the statute of
15 limitations for two years when the plaintiff is, at the time the cause of action accrued, an inmate
16 serving less than a life sentence. See Cal. Code. Civ. P. 352.1(a). This tolling provision applies
17 to all inmates except those sentenced to life without the possibility of parole. See <u>Brooks v.
18 Mercy Hospital</u>, 204 Cal. Rptr.3d 289, 291-92 (Cal. App. 2016) (holding § 352.1(a) is applicable
19 to prisoners serving a sentence of life with the possibility of parole, but the statutory language
20 excludes those sentenced to life without the possibility of parole). Thus, unless an inmate is
21 serving a sentence of life without the possibility of parole, a four-year limitation period applies.
22 State tolling is also available for the time an inmate is exhausting the administrative grievance
23 process. See <u>Soto v. Unknown Sweetman</u>, 883 F3d 865, 871 (9th Cir. 2018).

24         Notwithstanding the application of the forum's state law regarding the statute of
25 limitations, including statutory and equitable tolling, in the context of a § 1983 action, it is
26 "federal law" which "governs when a claim accrues." <u>Fink v. Shedler</u>, 192 F.3d 911, 914 (9th
27 Cir. 1999) (citing <u>Elliott v. City of Union City</u>, 25 F.3d 800, 801-02 (9th Cir.1994)). "A claim
28 accrues when the plaintiff knows, or should know, of the injury which is the basis of the cause of

11

action." Id. (citing Kimes v. Stone, 84 F.3d 1121, 1128 (9th Cir. 1996)); see also TwoRivers v. Lewis, 174 F.3d 987, 991 (9th Cir. 1999).

Defendants argue that Plaintiff's claim against Dr. Wong is barred by the statute of limitations and that no tolling options would make the complaint timely. See ECF No. 28-2, pg. 25. Defendants do not provide evidence of Plaintiff's sentence and presume that the longer four-year limitations period applies in this case. The Court does so as well. Defendants also concede that Plaintiff is entitled to tolling through November 10, 2014 – the date his administrative grievance process against Dr. Wong was concluded – and further presume that this is the date on which the four-year limitations period began.

Assuming for this analysis that the longer four year limitations period began on November 10, 2014, and applying the four-year limitations period, Plaintiff's complaint would have been due in November 2018. Plaintiff, however, did not initiate this action until nine months later on August 23, 2019. See ECF No. 1. The Court agrees with Defendants that Plaintiff's claim against Dr. Wong is barred by the statute of limitations.

### C.     Merits of Eighth Amendment Claim

Notwithstanding the exhaustion and timeliness arguments addressed above, which are dispositive as to all three defendants, Defendants further contends that the undisputed evidence shows that Plaintiff cannot prevail on the merits of his Eighth Amendment claims against them. The Court agrees.

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when

two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind." See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by Sandin v. Conner, 515 U.S. 472 (1995). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain. See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The complete denial of medical attention may constitute deliberate indifference. See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996). Simply showing that a course of treatment proves to be ineffective, without showing that the medical professional's conduct was medically unacceptable under the circumstances and chosen in conscious disregard to Plaintiff's health, does not establish a claim for deliberate indifference. Nicholson v. Finander, 2014 WL 1407828 (C.D. Cal. Apr. 11, 2014) (citing Estelle, 429 U.S. at 105, 97 S.Ct. 285; Toguchi, 391 F.3d at 1058).

### 1. Dr. Wong

Defendants contend that, far from showing deliberate indifference, the undisputed evidence reveals that Dr. Wong diligently and consistently provided Plaintiff treatment. See ECF No. 28-2, pgs. 29-31. The Court agrees.

Plaintiff alleges that Dr. Wong was deliberately indifferent to his varicose vein condition and treatment. See ECF No. 12. Plaintiff was treated by Dr. Wong from December 3, 2013, until September 30, 2014. See ECF No. 28-6, ¶¶ 6, 20. Plaintiff first mentioned his varicose veins on May 23, 2014. See id. at ¶ 9. At that time, Dr. Wong recommended conservative treatment, including compression stockings, elevating is leg, exercising, and a decreased salt diet. See id. Dr. Wong also put Plaintiff on a permanent chrono which he could use to avoid long periods of prolonged standing and heavy lifting. See id. at ¶ 11. Though Plaintiff reported concerns about foot pain causing numbness and tingling in his toes, he did not complain of his varicose veins again until he filed Grievance MCSP HC 14045232. See id. at ¶ 11. Dr. Wong met with Plaintiff about the grievance on July 17, 2014. See id. at ¶ 12. This is when Plaintiff requested surgical evaluation. See id. In response, Dr. Wong referred Plaintiff for Duplex Doppler Ultrasound, a non-invasive way to examine the nature and severity of the varicose veins. See id. at ¶ 13. During this consultation, Plaintiff informed Dr. Wong that he was able to ambulate well, had no restriction to his activities, and that the pain was manageable. See id. at ¶ 12.

///

On August 1, 2014, the ultrasound request was denied because it did not qualify as medically necessary. See id. at ¶ 14. Dr. Wong continued to provide conservative care to Plaintiff. See id. at ¶ 15. Plaintiff also received care for unrelated foot pain, seemingly caused by his plantar fasciitis. See id. at ¶ 17-19. Plaintiff did not mention his varicose veins during his last appointment with Dr. Wong on September 30, 2014. See id. at ¶ 20. Dr. Wong used his training, experience, and review of medical records to determine that conservative treatment was the appropriate treatment for Plaintiff. See id. at ¶ 25. Plaintiff's mobility did not seem to be affected, given his continued participation in prison activities and he reported that his pain was manageable. See id. Furthermore, in the years since leaving Mule Creek, no doctor has recommended anything other than conservative treatment for Plaintiff's varicose veins. See ECF No. 28-9, ¶ 26-33.

Plaintiff has failed to show that Dr. Wong "acted unnecessarily and wantonly for the purpose of inflicting harm." Each doctor he has seen has recommended the same care, and Dr. Wong recommended further treatment though it was deemed medically unnecessary. Plaintiff continued to work jobs that required him to be on his feet for long periods of time. Plaintiff did complain of pain, but multiple medical professionals have determined that the pain is more likely the result of another condition. See ECF Nos. 28-5, ¶ 29; 28-6, ¶ 26; 28-7 ¶ 23; 28-9, ¶ 34. The evidence, which Plaintiff does not dispute, shows that Plaintiff cannot establish that Dr. Wong's conduct was "medically unacceptable" or that Dr. Wong failed to provide treatment. Plaintiff's claim against Dr. Wong amounts to no more than a difference of opinion as to the proper course of treatment. Such a claim is not actionable in a civil rights action under § 1983.

2.   Dr. Ashe

As with Dr. Wong, Defendants argue that Plaintiff cannot establish that Dr. Ashe was deliberately indifferent to a serious medical need. See ECF No. 28-2, pgs. 31-33. Again, the Court agrees.

///

///

///

15

Plaintiff alleges that Dr. Ashe was deliberately indifferent to his varicose vein condition and treatment. See ECF No. 12. Plaintiff was treated by Dr. Ashe from October 2016 until July 2017. See ECF No. 28-7, ¶ 6. On November 16, 2016, Plaintiff reported his varicose vein condition to Dr. Ashe. See id. at ¶ 7. In response to Plaintiff's reports of increased leg discomfort and swelling, Dr. Ashe referred Plaintiff for Duplex Doppler Ultrasound. See id. Dr. Ashe further advised that Plaintiff continued conservative care, namely losing weight, and exercising, as Plaintiff was medically obese. See id. The request for the ultrasound was approved on November 29, 2016, and completed on January 10, 2017. See id. at ¶ 9. The ultrasound results showed normal blood flow and no evidence of complications with Plaintiff's varicose veins. See id. On March 8, 2017, Plaintiff reported worsening varicose veins despite the conversative treatment and asked for a referral for vascular surgery. See id. at ¶ 11. Dr. Ashe continued to recommend conservative treatment and ordered a new pair of compression stockings. See id. Despite believing that conservative treatment was appropriate, Dr. Ashe also put in a referral for the vascular surgery. See id. at ¶ 11-12. Dr. Ashe also submitted a request for physical therapy due to Plaintiff's reports of back pain, stiffness, and pain in his left hip. See id. at ¶ 14. Dr. Ashe's request for physical therapy for Plaintiff was approved, however, the referral for vascular surgery was denied by the Medical Authorization Review Committee (MARC). See id. at ¶ 15.

Dr. Ashe continued conservative care, and Plaintiff started physical therapy. See id. at ¶ 20, However, Plaintiff reported that he was not doing the exercises recommended by the physical therapist and eventually requested to terminate physical therapy. See id. Plaintiff did not lose weight during this time and had not requested further medical notes to be relieved from work or be provided with limited duty assignment. See id. at ¶ 18. Based on this, Dr. Ashe did not believe that the varicose veins were impacting his daily activities or causing significant pain.

The evidence, which Plaintiff does not dispute, establishes that when prompted by Plaintiff's requests, Dr. Ashe repeatedly requested further treatment for Plaintiff, though Dr. Ashe continued to believe that conservative treatment was medically reasonable. Plaintiff's apparent contention that a different course of treatment should have been followed fails to state a claim. Defendant Ashe is also entitled to judgment as a matter of law.

16

### 3. Dr. Smith

Finally, Defendants argue that Dr. Smith similarly provided consistent treatment and that Plaintiff's claim amounts to nothing more than a difference of medical opinion. The Court agrees.

Plaintiff alleges that Dr. Smith was deliberately indifferent with his review and denial of physical-requested ultrasounds or surgery. See ECF No. 12. Defendants argue that there is no evidence to suggest that these denials were medically unacceptable. See ECF No. 28-2, pg. 33. Dr. Smith was never Plaintiff's primary care physician, but rather reviewed requests for treatment made by Dr. Wong and Dr. Ashe. See ECF No. 28-5, ¶¶ 4, 6, 17, 24. Dr. Smith's first involvement with Plaintiff's care was when Dr. Smith reviewed Plaintiff's grievance. See id. at ¶ 6. Dr. Smith determined the grievance paperwork and notes from the interview with Dr. Wong, after which Dr. Wong requested an ultrasound, constituted a partial grant of Plaintiff's grievance. See id. at ¶ 8. Dr. Smith did not participate in the second or third levels of review of Plaintiff's grievance. See id. The next involvement Dr. Smith had with Plaintiff's medical care was when Dr. Smith reviewed Dr. Wong's request for a Duplex Doppler Ultrasound. See id. at ¶ 10. Dr. Smith denied this request because Plaintiff's medical records showed that Plaintiff reported an ability to ambulate well and stated that his pain was manageable. See id. at ¶ 11. Dr. Smith accordingly determined that the ultrasound was not medically necessary. See id. Health care services must be medically necessary for a request to be granted. See id. at ¶¶ 11, 12.

Dr. Smith also reviewed Dr. Ashe's requests for an ultrasound. See id. at ¶ 14. Dr. Smith approved this request because it "provided a second opinion and demonstrated new potential concerns of worsening symptoms, which justified the ultrasound." See id. Dr. Smith also reviewed Dr. Ashe's request for Plaintiff to receive vascular surgery, which he deferred to MARC. See id. at ¶¶ 17, 18. MARC denied this request, and though Dr. Smith was present, he did not make the decision to deny the surgical request. See id. at ¶ 20. However, he agreed with MARC's decision, as the risks of the surgery weighed in favor of denial, the ultrasound showed the veins were not causing serious complications, there was evidence that there was an alternative cause of pain, and Plaintiff did not request any further accommodations to reduce standing at

17

work. See id. at ¶¶ 20-23. Dr. Smith reviewed and approved Dr. Ashe's request for physical therapy. See id. at ¶ 24.

The Court finds that Plaintiff cannot establish that Dr. Smith was deliberately indifferent to his medical needs. To the contrary, the undisputed evidence shows that Dr. Smith came to decisions about Plaintiff's medical care based on review of Plaintiff's medical records and that Dr. Smith provided medically appropriate treatment.

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that Defendant's unopposed motion for summary judgment, ECF No. 28, be GRANTED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  June 26, 2023

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE